# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MOORE'S MAINTENANCE & INSTALLATION, INC., | ) ) ) |
| Plaintiff, | ) ) |
| | ) No. 04-C-4891 |
| v. | ) |
| HUB GROUP DISTRIBUTION SERVICES, LLC and HUB GROUP, INC., | ) HONORABLE DAVID H. COAR ) ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Moore's Maintenance & Installation, Inc. ("Moore" or "Plaintiff") is suing Hub Group Distribution Services, LLC and Hub Group, Inc. (collectively, "Hub" or "Defendants") for breach of contract, unjust enrichment, breach of the duty of good faith, and fraud in the inducement. Before this court is Defendants' motion to dismiss the Complaint for lack of subject matter jurisdiction. For the reasons set forth below, Defendants' motion to dismiss is DENIED.

## I. FACTUAL BACKGROUND[1]

Plaintiff Moore's is a Pennsylvania corporation that, among other things, installs display racks, signage, and other fixtures and materials at retail, wholesale and other locations.[2] Defendant Hub Group, Inc. is an affiliate of Defendant Hub Group Distribution Services, LLC, an Illinois corporation with a place of business in Pennsylvania. The corporation offers logistics, distribution, transportation, warehousing, inventory management, and installation services to manufacturers, distributors, and other firms. Hub provides these services with the assistance of subcontractors like Plaintiff.

In July of 1999, Plaintiff began working with Defendants through a third corporation. In October of 1999, Plaintiff began working directly with Defendants as a vendor. Between July and October 1999, "a problem arose regarding the storage of freight" Defendants inadvertently sent to Plaintiff. (Compl. ¶ 16.) Plaintiff stored the freight in a facility that Defendants instructed Plaintiff to rent. Plaintiff incurred significant costs in renting the facility and then sending the freight to other vendors. Invoices reflecting these costs were sent to different agents of Defendants but were never paid. Defendants later approached Barbara Moore ("Moore"), vice president and secretary of Moore's, with a reduced settlement. Plaintiff rejected the settlement, but continued to do work for Defendants during this time, including participating in Defendants' Three Tier program and performing site surveys at Defendants' request.

---

[1] For the purposes of this motion, the facts alleged in Plaintiff's complaint are taken as true. For several of the allegations that follow, the Complaint provides neither an exact date nor an approximation of a date.

[2] This paragraph includes facts stated in the Service Agreement between Plaintiff and Defendants, attached to Defendants' Motion to Dismiss as Exhibit A.

Defendants then requested Plaintiff to provide services for test stores. When Defendants informed Plaintiff what Plaintiff would be paid for servicing the stores, Moore verbally informed Defendants' agents that Plaintiff would not be able to accept the pricing and that Plaintiff would lose money on the project. After disputing the pricing, Plaintiff continued to do work for Defendants. Plaintiff completed work on eleven stores.

Moore later met with John Shipley ("Shipley"), a Hub executive. Moore informed Shipley that Plaintiff would not be able to continue work if Defendants did not supply the appropriate pricing. Shipley then asked what it would take for Plaintiff to continue work; Moore responded, "3,500." Shipley then stated that Plaintiff would receive $3,500 for each store.

The next day, Shipley called Plaintiff to renegotiate the pricing of the work already done by Plaintiff. Plaintiff declined the offer. About one week later, Plaintiff received a termination letter from Defendants. Defendants have not paid any money to Plaintiff for the finished jobs.

Count I of Plaintiff's Complaint alleges breach of contract for Defendants' failure to pay, as agreed, for labor and expertise supplied by Plaintiff. Count II alleges unjust enrichment because Defendants have received good and services for which they failed to pay. Count III alleges that Defendants breached the duty of good faith. Finally, Count IV alleges fraud in the inducement: Defendants made a knowingly false, fraudulent, and unsupported representation that they would provide Plaintiff with "significant work, on a national basis" in exchange for Plaintiff's paying for the storage of Defendants' freight. (Compl. ¶ 43.) Plaintiff alleges that Defendants made this representation "purely to enable Defendant[s] to leach storage services and other service for labor" without intending to pay those for services. (Compl. ¶ 45). Plaintiff alleges damages in excess of $2,000,000.

## II.  LEGAL STANDARD

When reviewing a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff.  Long v. Shorebank Development Corp., 182 F.3d 548, 554 (7th Cir. 1999).  The court may look beyond the pleadings and "view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."  Id. (internal citations omitted).

The party invoking federal jurisdiction bears the burden of establishing the elements of jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  If the court or the opposing party challenges jurisdiction as a factual matter the party invoking the jurisdiction must support its jurisdictional allegations by "competent proof."  McNutt v. General Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936); Rexford Rand Corp. v. Ancel, 58 F.3d 1215, 1218 (7th Cir. 1995).  Competent proof means "proof to a reasonable probability that jurisdiction exists."  Target Market Publishing, Inc. v. ADVO, Inc., 136 F.3d 1139, 1142 (7th Cir. 1998) (internal citations omitted).

## III.  ANALYSIS

Defendants have moved for dismissal on the ground that the Complaint does not satisfy the amount in controversy requirement of 28 U.S.C. § 1332.  See 28 U.S.C. § 1332 (2005) (restricting diversity suits in federal court to civil actions where the amount in controversy exceeds $75,000). According to Defendants, it is unclear from the Complaint's allegations how Plaintiff has determined damages totaling $200,000: If Plaintiff's theory is that it was not paid

for the eleven test stores it completed, at $3, 500 per store, the amount in controversy is only $38,500. Moreover, Defendants argue, Plaintiff's Response Memorandum claims that Plaintiff completed *thirteen*, not eleven, test stores. Even using this second figure, the amount in controversy totals only $45,500.

Because Defendants have contested the amount in controversy, Plaintiff must support its allegation with proof to a reasonable probability that jurisdiction exists. See Rexford Rand, 58 F.3d at 1218 ("[When] a defendant challenges the plaintiff's allegation of the amount in controversy, the plaintiff must support its assertion with "competent proof.'"). Plaintiff attempts to do so primarily by means of an affidavit by Barbara Moore. According to Plaintiff, the Affidavit demonstrates that Plaintiff's minimum damages are between $125,414.75 and $127,414.75, the sum of: (1) money owed for completed installation work, calculated by Moore to be $57,664.75 exclusive of interest; (2) lost profit of $57,750, assuming a thirty percent-per-store profit on fifty-five installation jobs committed to by Defendants but not ultimately provided;[3] and (3) extended warehousing costs amounting to $10,000 or $12,000. The Court takes each element of this damages figure in turn to determine whether Plaintiff has supported the alleged sum with "proof to a reasonably probability." Target Market Publishing, 136 F.3d at 1142.

### A. Payment for the Completed Test Stores

Plaintiff alleges that it completed either eleven (in the Complaint) or thirteen (in Plaintiff's Response Memorandum) test stores for which it has not been paid. Plaintiff has

---

[3] Plaintiff did not allege this lost profit in the Complaint.

attached to the Complaint a chart that details the work order name, the work order number, the scheduled completion date, and the actual completion date for several projects. That chart states a total of $57,664 owed to Plaintiff for completed projects, and illustrates how this figure was reached as there are itemized entries for each project that, added together, total $57,664. Furthermore, the affidavit by Barbara Moore states that "13 jobs were completed by Moore's (and are included in the $57,644.75 [on the above-referenced chart])." (Moore Aff. ¶ 5.) Finally, the Service Agreement written by Defendants and accepted by Plaintiff states that Plaintiff shall be paid for all completed work. Section 3 states that "[s]ubcontractor's sole compensation for Installation Services performed under this Agreement shall be the fees . . . in effect at the time such Installation Services are completed. Such fees will be payable to Subcontractor . . . following full completion and acceptance of all Services . . . ." (Kutschat Decl., Ex. A. ¶ 3.) Section 10(a) of the agreement states that "[u]pon the termination of this Agreement for any reasons other than default of Subcontractor hereunder, Subcontractor shall be entitled to unpaid fees . . . for (i) Installation Services . . . that is [sic] fully completed in accordance herewith prior to the effective date of the termination of this Agreement . . . ." (Kutschat Decl., Ex. A. ¶ 10(a).)

Given the Service Agreement's provision that Plaintiff shall be paid for all completed work, the chart detailing the completed projects and their associated costs, and the Moore Affidavit, this Court concludes that Plaintiff has provided proof to a reasonable probability of at least $57, 664 in damages.

### B. Lost Profit on Fifty-Five Installation Jobs

Plaintiff also alleges, in its Response Memorandum, not in the Complaint, that Defendants orally promised Plaintiff fifty-five installation jobs but did not provide those jobs.[4] Plaintiff, therefore, seeks $192,500 in lost profits, calculated at $3,500 per store and assuming a 30 percent profit given Plaintiff's labor costs. As competent proof of this allegation Plaintiff provides three pieces of information: (1) the Moore Affidavit; (2) the chart, discussed above, detailing the work orders Plaintiff completed for Defendants; and (3) a computer print out from Defendants' system.

The first and third items, but not the second, constitute competent proof that Plaintiff can allege $192,500 in lost profits. The Affidavit contains Moore's "good faith estimate of the profit [Moore's] would have received" on the jobs allegedly promised by Defendants, based on the man-hours required at a rate of $15 an hour. (Moore Aff. ¶ 6.) The Affidavit also describes the conversation between Moore and agents of Hub which Plaintiff uses to support its fraudulent inducement claim. The second item, the chart detailing the work orders Plaintiff completed for Defendants, contains only one relevant line. That line merely states "55 stores promised" and lists a total of $192,500. (Compl., Ex. A, at 3). This line, alone, is less sturdy proof of Plaintiff's damages claim. The third item serves as stronger proof: Plaintiff has attached to its Response Memorandum a print out from, Plaintiff claims, "Defendants' own computer system." (Moore Aff. ¶ 5.) That print out, which lists the number of "installs" Defendants associated with various subcontractors, lists sixty-nine as the number of installs associated with Plaintiff.

---

[4] Plaintiff sometimes, but not always, depicts the fifty-five jobs as "unfinished jobs," suggesting that Plaintiff may have begun work on the stores. (Moore Aff. ¶¶ 5,6.)

According to Plaintiff, this number proves Defendants promised Plaintiff fifty-five additional jobs: Defendants promised Plaintiff a total sixty-nine jobs, Plaintiff completed work on thirteen, and one job was removed from the list, leaving fifty-five jobs.

Defendants refute Plaintiff's claim to $192,500 in lost profits on the grounds that (a) Plaintiff cannot amend its Complaint (which makes no mention of fifty-five additional installation jobs) in response to a motion to dismiss; (b) Plaintiff cannot recover for jobs that it neither began nor completed because the Service Agreement contemplates payment only for completed work; and (c) Plaintiff cannot vary by oral agreement the terms of the Service Agreement, which forecloses oral modification.

The case law Defendants have cited in support of its first proposition–that Plaintiff cannot amend its Complaint in response to a motion to dismiss–governs 12(b)(6) claims, not, as here, 12(b)(1) claims. To the contrary, "[a] plaintiff need not put all of the essential facts in the complaint. He may add them by affidavit or brief . . . ." Hrubec v. National Railroad Passenger Corp., 981 F.2d 962, 963 (7th Cir. 1992). Thus, although Plaintiff does not mention the fifty-five jobs it argues Defendants promised but failed to supply in the Complaint, the Court will read the allegation as support for facts that *are* alleged in the Complaint. The fifty-five jobs, for example, are possibly the "significant work, on a national basis" that the Complaint alleges Defendants promised Plaintiff to secure continued service, labor, and warehousing. (Compl. ¶ 43).

Defendants' second and third grounds opposing Plaintiff's claim to lost profits essentially–and impermissibly–ask this Court to decide Plaintiff's claim on the merits.

"The test for whether a case satisfies the amount in controversy requirement is whether the complaint makes a good-faith claim for the amount, not whether the plaintiff is actually entitled to such an amount. Otherwise every diversity case that a plaintiff lost on the merits would be dismissed for lack of federal jurisdiction, allowing the plaintiff to start over in state court. Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1121 (7th Cir. 1998) (internal citations omitted). Defendants would have the Court to determine whether the parties reached an oral agreement, and if so, whether the contract forecloses recovery under such an agreement. This type of inquiry, however, goes beyond the scope of a 12(b)(1) motion to dismiss. Instead, the Court finds that Plaintiff has proven to a reasonable probability lost profits from fifty-five jobs allegedly promised to Plaintiff by Defendants.

### C. Extending Warehousing Costs

Lastly, Plaintiff alleges that it incurred $10,000 or $12,000 in costs warehousing Defendants' freight. While Plaintiff's Complaint and Response Memorandum *refer* to the warehousing issue, the pleadings fail to *cite* this or any other dollar amount in damages for warehousing. Plaintiff provides two items to prove the $10,000 to $12,000 figure: the Moore Affidavit and an email from a Hub manager to Moore.

Moore's Affidavit alleges that "HUB Group agreed to pay Moore's for extended warehousing." (Moore Aff. ¶ 10.) The Affidavit further states:

> HUB offered only $3,574.70 in full settlement of [Plaintiff's] warehousing costs. This amount was inadequate and not accepted. An additional ten to twelve dollars is owed to Moore's for extended warehousing of fixtures Moore's never used or needed on jobs but was required to store for HUB . . . . Approximately 10,000 square feet of space was needed for this warehousing. HUB is responsible for these costs.

(Moore Aff. ¶ 12.) This Affidavit contains nothing more than a restatement of the allegation in the Complaint that Plaintiff incurred costs in warehousing Defendants' freight. Although the $10,000 to $12,000 figure in the Affidavit is new, Plaintiff has done nothing to show how that figure was determined. The Complaint, for example, states that "[i]nvoices reflecting these costs were sent to different agents of [Defendants] but were never paid." (Compl. ¶ 18.) Plaintiff has not attached to its pleadings the invoices, or described the calculations reflected on the invoices. Plaintiff has not provided the dates of warehousing or its general rates for warehousing. Plaintiff has attached only the email from Phil Manzie, a Regional Operations Manager of the Northeast Region of Hub, to Barbara Moore. That email merely establishes that Defendants approved $3,574.70 to pay Plaintiff for warehousing and that Plaintiff accepted the amount but refused to sign for it because Plaintiff wanted additional money to cover shipping and handling. The email further states that Plaintiff should resubmit its request for shipping and handling costs. The email does not provide any support for Plaintiff's allegation that it is owed $10,000 to $12,000 for warehousing Defendants' freight; they body of the email does not even contain a figure aside from the $3,574.70 mentioned above. Thus, the email, like the vague assertion in Moore's Affidavit, is insufficient as "proof to a reasonable probability" that Plaintiff is owed this final damages figure. See e.g., NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 237(7th Cir.1995) (district court did not err in dismissing claims for which Plaintiff did not add any information on the amount of damages).

## IV.     CONCLUSION

While Plaintiff has not supplied competent proof of damages in the amount of $10,000 to $12,000 for extended warehousing costs, Plaintiff has supplied competent proof of damages in the amount of $57,664 for eleven or thirteen completed test stores and $192,500 in lost profits for jobs allegedly promised by Defendants.

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction is DENIED.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **October 25, 2005**